**SOUTH CAROLINA INS. COMPANY, Plaintiff,**

v.

**Frances M. COODY, et al., Defendants.**

**Civ. A. No. 92–54–4–MAC (WDO).**

United States District Court, M.D. Georgia, Macon Division.

Feb. 11, 1993.

## ORDER

OWENS, Chief Judge.

Before the court is plaintiff's motion for summary judgment. After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order.

## FACTS

In this case, plaintiff South Carolina Insurance, Co. seeks a declaratory judgment that it is not liable to defendants for coverage provided in two insurance policies issued to the T.A. McCord, Jr., Trust ("Trust"). Defendants Frances M. Coody and Timothy A. McCord are trustees of the Trust. The policies at issue are comprehensive general liability policies providing coverage for property and casualty losses on a piece of property formerly owned by the Trust in Byron, Georgia ("Byron property").

In July, 1967, Turner Ashby McCord, Jr., purchased the Byron property. He leased this property to Peach Metal Industries, Inc. ("PMI"), an electroplating plant, in 1971.

In 1977, the Georgia Environmental Protection Division ("EPD") inspected the Byron property, determined that PMI's existing system for treating industrial waste was insufficient, and ordered PMI to improve its waste disposal plan. PMI proposed a plan in which PMI would pipe industrial waste from the plant into two impoundment ponds, or lagoons, designed to hold the waste on the property. Both the EPD and McCord approved the plan, and PMI immediately implemented it.

In 1982, Turner Ashby McCord, Jr., set up the T.A. McCord, Jr. Trust, with defendants Timothy A. McCord and Frances M. Coody as trustees for the Trust. The Trust acquired an insurance policy ("1984 policy") from plaintiff for coverage of certain real estate owned by the Trust on July 4, 1984.

On November 30, 1984, Turner Ashby McCord, Jr., conveyed the Byron property to the Trust by quitclaim deed. The Byron property was added to the 1984 policy on

William S. Goodman, Edward H. Lindsey, Atlanta, GA, for plaintiff South Carolina Ins. Co.

Linwood Robert Lovett, J. Douglas Cowart, Macon, GA, for defendants Frances M. Coody and Timothy A. McCord, trustees for T.A. McCord, Jr.

April 18, 1985. The 1984 policy remained in effect on the Byron property through July 4, 1987.

On April 7, 1987, the EPD conducted an investigation on the Byron property in response to a water quality complaint. During the investigation, an EPD official discovered that PMI was generating hazardous waste and improperly disposing of it on the Byron property. The hazardous waste consisted of wastewater sludge generated during PMI's electroplating operations.

The EPD found that PMI was discharging wastewater sludge into the soil through its practice of pumping the sludge to the two lagoons on the property. In addition, discharge from one lagoon entered a drainage ditch connected to a creek located off the property. Further discharge into the soil and into the creek resulted from a black oxide process used by PMI.

The EPD also discovered several drums containing various hazardous chemicals in various states of corrosion on the property. PMI had purchased these drums from a now-defunct chemical company in 1985.

Timothy McCord learned of the EPD investigation and met with Al DeGraw, president of PMI, to discuss it during the summer of 1987. DeGraw told McCord that the EPD was requiring PMI to change its operations, but that there was nothing to worry about.

In July, 1987, the EPD issued a Notice of Violation letter to PMI effective August 18, 1987. PMI negotiated with EPD to extend the time for compliance with the order through September 8, 1987. DeGraw later informed McCord that it was economically infeasible for PMI to make the required modifications, and therefore, PMI would be forced to go out of business. PMI ceased operations in September, 1987.

Immediately after it ceased operations, PMI remained on the Byron property to attempt to clean up. However, a week later, Timothy McCord denied PMI access to the property because PMI owed back rent. PMI subsequently filed for bankruptcy on October 26, 1987.

On September 18, 1987, the McCord Trust conveyed the Byron property to Concrete Sales & Service, Inc. ("Concrete Sales"), a concrete mixing plant. Timothy McCord is the president of Concrete Sales, and the McCord Trust is its sole stockholder.

On February 12, 1988, the EPD contacted Timothy McCord regarding ownership of the Byron property. McCord informed the EPD that the property was currently owned by Concrete Sales. On May 5, 1988, the EPD notified Concrete Sales and requested the corporation's assistance in correcting the conditions on the property.

In April, 1988, the bankruptcy trustee for PMI proposed to the bankruptcy court that PMI abandon all PMI materials and assets remaining on the Byron property. Timothy McCord protested the proposal, but the bankruptcy court ultimately approved the abandonment.

In July, 1988, McCord met with EPD officials and learned that Concrete Sales, as owner of the Byron property, was liable for the costs of cleaning up the property. However, he was not informed that prior owners of the property could also be held liable for these costs.

In May, 1988, the McCord Trust obtained a new insurance policy ("1988 policy") from plaintiff, effective from May 23, 1988, to May 23, 1989. The Byron property was not originally listed under the 1988 policy.

Between June, 1988, and December, 1988, McCord, as president of Concrete Sales, actively negotiated with EPD concerning ways to remedy the hazardous waste problems on the Byron property. Concrete Sales retained counsel in October, 1988, to aid in these negotiations.

In December, 1988, McCord contacted plaintiff to attempt to add the Byron property to the Trust's 1988 policy. McCord informed plaintiff's agent that the Trust owned the Byron property and described the property as a "vacant building." The request was denied.

In January, 1989, McCord again attempted to add the Byron property to the Trust's 1988 policy. McCord described the proper-

ty as "ten acres of vacant land located in Byron, Georgia." Plaintiff added the Byron property to the 1988 policy, effective January 6, 1989. This policy was in effect through May 23, 1991.

Between 1989 and 1990, there was little EPD activity regarding the Byron property due to the death of the EPD official handling the PMI file. Then, on December 13, 1990, the EPD sent a notice of violation to McCord for resolution of the hazardous waste problems on the Byron property. This was the first time the EPD informed McCord of the potential liability of previous owners of the Byron property for cleanup costs.

The United States Environmental Protection Agency ("EPA") sent McCord a Notice of Potential Liability regarding the cleanup of the Byron property on December 14, 1990. This was the first time McCord learned of the potential liability of previous owners to the EPA for cleanup costs.

On December 31, 1990, the Trust sent notice to plaintiff concerning a potential occurrence and claim on the Byron property. Plaintiff did not respond to this notice, and the Trust sent another notice to plaintiff regarding its potential liability on March 6, 1991.

The EPA issued an administrative order concerning the Byron property on February 12, 1991. In this order, the EPA made the following findings:

1. That between 1971 and 1980, PMI discharged hazardous waste directly into a drainage ditch that flowed into a creek located outside the property.

2. That in 1982, PMI constructed two lagoons that were used for the disposal of hazardous waste.

3. That there are numerous drums containing hazardous wastes located on the Byron property and that these drums are in an unprotected condition.

4. That the past, present, or future migration of hazardous wastes from the site constitutes a threatened release.

The EPD issued an administrative order concerning the Byron property on April 17, 1991. This order cites numerous violations of the Georgia Hazardous Waste Management Act, O.C.G.A. § 12–8–60 et seq.

Plaintiff filed this declaratory action on January 31, 1992. It seeks a declaratory judgment holding that it owes no obligation to defendants under the 1984 and 1988 policies. Defendants have filed a counterclaim, seeking the proceeds under the policies and damages for bad faith breach of contract.

## DISCUSSION

In its motion for summary judgment, plaintiff has raised five grounds to establish that it owes no obligation to defendants under the 1984 and 1988 insurance policies: (1) that no occurrence took place within the time periods covered by the policies; (2) that recovery is barred by the pollution exclusion clauses; (3) that recovery is barred by the owned-property exclusion; (4) that defendants made material misrepresentations in procuring the 1988 policy; and (5) that defendants failed to provide plaintiff with timely notice of an occurrence.

### I. THE OCCURRENCE PROVISION

Plaintiff contends that defendants cannot show that an "occurrence" took place during the effective dates of either policy. Plaintiff argues that, under the terms of both policies, an "occurrence" consists of both the cause of the injury and the injury itself. Defendants, on the other hand, argue that the court should use the "continuous trigger test" in determining whether an occurrence took place within the policy periods. They further argue that they have established that an occurrence took place within each policy period under this test, and are consequently entitled to coverage.

Thus, the court must decide how to determine when an occurrence takes place in a case involving a claim for recovery of environmental cleanup costs. This case is a diversity case to which Georgia law applies, and the court notes that no Georgia court has ever addressed this issue. Thus, this court must determine how the Supreme Court of Georgia would decide the

issue, basing its determination upon the language of the policies and decisions of other courts.

## A. The Language of the Policies

Both the 1984 and 1988 policies provide coverage that is standard in comprehensive general liability policies. Moreover, although the language of each slightly varies, both policies offer the same basic coverage.

### 1. The 1984 Policy

The 1984 policy was effective from April 18, 1985, to July 4, 1987. It provides coverage as follows:

> The company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as damages because of
>
> A. *bodily injury* or
> B. *property damage*
>
> to which this insurance applies, caused by an *occurrence* and arising out of the ownership, maintenance, or use of the *insured premises*.... (emphasis in original).

In addition, the term "occurrence" is defined as:

> [A]n accident, including continuous or repeated exposure to conditions, which results in *bodily injury* or *property damage* neither expected not intended from the standpoint of the *insured*. (emphasis in original).

Moreover, "property damage" in the 1984 policy means:

> (1) [P]hysical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
> (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the policy period. (emphasis in original).

Plaintiff contends that the language of this policy is unambiguous and requires

defendants to establish that both the "accident", or cause of contamination on the Byron property, and the "injury" occurred during the policy period. *See Continental Casualty Co. v. Synalloy Corp.*, 667 F.Supp. 1563, 1575 (S.D.Ga.1986) (in order to establish that an "occurrence" took place, the insured must show that both the cause and effect happened during the policy period), *aff'd*, 826 F.2d 1024 (11th Cir. 1987).

However, a reading of *this* policy shows that it unambiguously requires that only the "injury" must occur within the policy period. *Commercial Union Insurance Co. v. Sepco Corp.*, 765 F.2d 1543, 1545 (11th Cir.1985) ("The language of each policy at issue in this case clearly provides that an "injury," and not the "occurrence" that causes the injury, must fall within a policy period for it to be covered by the policy.") (quoting *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1041 (D.C.Cir.1981)).[1]

Unfortunately, this unambiguous language does not aid the court at all in determining whether an occurrence took place during the policy period. Because of the nature of waste contamination, there is great difficulty in determining when the "accident" and "injury" occurred, and courts have adopted various approaches for resolving this difficulty. The various approaches will be addressed in a subsequent section of this opinion.

### 2. The 1988 Policy

The effective dates of the 1988 policy are from January 6, 1989, to May 23, 1991. This policy provides the following coverage:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.... This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occur-

---

**1.** However, whether both the "accident" and "injury" must occur within the policy period is

irrelevant to this case, as will be discussed later in this opinion.

rence". The "occurrence" must take place in the "coverage territory.". . . .

Furthermore, "occurrence" under this policy means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" in the 1988 policy is defined as follows:

a. Physical injury to tangible property, including all resulting loss of use of that property; or

b. Loss of use of tangible property that is not physically injured.

The 1988 policy, like the 1984 policy, unambiguously states that only the "injury" has to occur within the policy period.

## B. Injury

■ In both policies at issue in this case, coverage is only provided if the "injury" takes place within the policy period. Thus, the court must determine whether the "injury" occurred between April 18, 1985, and July 4, 1987, or between January 6, 1989, and May 23, 1991.

Plaintiff contends that the injury in this case did not take place until December, 1990, when defendants were notified by the EPD and EPA that the Trust was a potentially responsible party liable for cleanup costs. Thus, defendants are not entitled to any coverage under the 1984 policy, which was only effective until July 4, 1987.

Defendants, on the other hand, contend that plaintiff's view of injury is too narrow. They argue that while the cleanup costs do constitute a part of the injury in this case, these costs are not the only injury. Instead, in environmental contamination cases, the injury continuously occurs from the first moment at which the property is exposed to hazardous wastes through the time at which cleanup costs are incurred. Therefore, under defendants' argument, they are entitled to proceeds under both policies because each policy was in effect during this continuous time period.

The court agrees with defendants' argument in part. Both policies describe "property damage" as "physical injury to tangible property," and it is clear that contamination of property by hazardous waste is a physical injury to tangible property. The cleanup costs are merely compensatory damages owed by the insured to the government as a result of environmental property damage. See Atlantic Wood Industries, Inc. v. Lumbermen's Underwriting Alliance, 196 Ga.App. 503, 396 S.E.2d 541 (1990); Continental Insurance v. Northeastern Pharmaceutical & Chemical Co., 811 F.2d 1180, 1189 (8th Cir.1987), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

In addition, a majority of courts have adopted the position that an occurrence takes place within the policy period if environmental damage occurred during this period. E.g., Continental Insurance, 811 F.2d at 1189 ("environmental damage occurs at the moment that hazardous wastes are improperly released into the environment and ... a liability policy in effect at the time this damage is caused provides coverage for the subsequently incurred costs of cleaning up the wastes.").

Thus, if defendants can establish that environmental damage occurred within the effective periods of these policies, then they are entitled to coverage under each policy. However, as will be subsequently discussed, the court does not adhere to defendants' position that injury in this case occurred up until the date on which they received notice that the Trust was a potentially responsible party.

### 1. The "Occurrence" Theories

In environmental contamination cases, it is very difficult to determine when environmental damage occurred. This difficulty arises because, as in this case, the damage is usually not discovered until several years after it first began. This problem is somewhat analogous to cases involving people who have been exposed to toxic substances like asbestos at one time and develop serious diseases several years later. See, e.g. Commercial Union Insurance Co. v. Sepco Corp., 765 F.2d 1543 (11th Cir.1985).

Thus, courts have adopted several approaches for determining when an injury occurred in cases involving exposure to tox-

ic substances. These approaches are characterized as determining whether an "occurrence" triggered coverage during the policy period.

In *Morrisville Water & Light Dept. v. United States Fidelity & Guaranty Co.*, 775 F.Supp. 718 (D.Ver.1991), the District Court of Vermont identified five different theories used by various courts to determine if an occurrence was triggered during the policy period in a case involving exposure to toxic substances:

(1) The Exposure Rule—damage occurs when the environment is first exposed to the toxic chemical; i.e. when the toxin is deposited in the landfill.

(2) The Manifestation Rule—damage occurs when it becomes apparent to the injured party; i.e. damage occurs when the EPA or private owner discovers that toxic waste has leaked onto the soil or into the groundwater.

(3) The Double Trigger Rule—damage occurs when the environment is first exposed to the toxic chemical and at the time the damage becomes apparent to the injured party.

(4) The Triple or Continuous Trigger Rule—damage occurs when the environment is first exposed to the toxic chemical, at the time the damage first becomes apparent, and at all times in between.

(5) The Actual Injury Rule—damage occurs when the property is actually harmed by the toxic chemical, but the damage does not have to be apparent because symptoms may manifest themselves well after the injury occurs.

In this case, it is unnecessary to determine which of the above approaches would be adopted by the Georgia Supreme Court because, under either policy, the same result occurs using any of the above approaches.

### a. The 1984 policy

■ In the 1984 policy, coverage is triggered under *every* approach used by courts in determining whether an occurrence took place during the policy period. It is undisputed that the 1984 policy was in effect both before the environmental damage on the Byron property was discovered and at the time it was discovered. Thus, the date of manifestation of at least some of the injury occurred during the 1984 policy period. As described above, the date of manifestation triggers coverage under the manifestation, double trigger, and continuous trigger rules. *See, e.g., Mraz v. Canadian Universal Insurance Co.*, 804 F.2d 1325 (4th Cir.1986).

The only other dates that may trigger coverage are the date of initial exposure, as required in the exposure rule, and the date of actual injury, as required in the actual injury rule. Thus, in this case, if defendants can show that the date of initial exposure and the date of actual injury occurred during the 1984 policy period, then they are entitled to coverage under the exposure and actual injury rules as well.

■ In addition, it is irrelevant whether an "occurrence" in this case consists of both accident and injury, as plaintiff argues, or only injury under the 1984 policy. This is because in environmental contamination cases, the accident and the injury occur at virtually the same time.

As the Eighth Circuit stated in *Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co.*, 811 F.2d 1180, 1189 (8th Cir.1987), "environmental damage occurs at the moment that hazardous wastes are improperly released into the environment." Thus, the improper release[2] is both the cause and the injury that triggers coverage.

In this case, there is no dispute that improper releases of hazardous wastewater sludge occurred on the Byron property from 1971, when PMI first began its electroplating operations, until 1987, when it ceased doing business. Improper releases occurred whenever PMI engaged in its electroplating operations. Thus, improper releases of wastewater sludge occurred between April 18, 1985, and July 4, 1987.

---

**2.** Under CERCLA, a release is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22).

The Byron property was initially exposed to and actually injured by this industrially-generated sludge during the 1984 policy period. *See, e.g., Continental Insurance,* 811 F.2d at 1192.

In addition, drums containing various hazardous chemicals were improperly disposed of by PMI on the property in 1985. Plaintiff concedes that at least some of these drums were disposed of on the property while the 1984 policy was in effect. The EPD then discovered these drums in various states of corrosion in April, 1987. Thus, improper releases of hazardous chemicals occurred during the 1984 policy period. *Id.*

The manifestation of at least some of the above improper releases occurred during the EPD investigation in April, 1987. Therefore, since improper releases occurred after the 1984 policy period went into effect, and these releases were discovered before the 1984 policy period ended, an occurrence took place that triggered coverage. This is the case under the exposure, manifestation, double trigger, continuous trigger, or actual injury rules. *See Morrisville Water & Light Dept. v. United States fidelity & Guaranty Co.,* 775 F.Supp. 718 (D.Ver.1991). Hence, plaintiff is not entitled to summary judgment on the 1984 policy based upon the "occurrence" issue.

### b. The 1988 policy

■ In the 1988 policy, coverage is not triggered under any of the five approaches used for determining whether an occurrence took place during the policy period. This is because, under every approach, coverage is not triggered *after* the environmental damage becomes apparent to the injured party. *See Morrisville,* 775 F.Supp. at 730–31. In this case, the environmental damage was first discovered in 1987, during an EPD investigation. However, defendants did not obtain coverage of the Byron property under the 1988 policy until January, 1989. Thus, the "occurrence" took place prior to the 1988 policy period. Furthermore, since PMI ceased operations in 1987, no other release or occurrence took place during the 1988 policy period.

■ It is settled insurance law that an insured is not entitled to coverage under a policy obtained after the insured is aware of an occurrence prior to the policy period. *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co.,* 788 F.Supp. 846, 853 (D.N.J.1992); *see also New Castle County v. Hartford Accident and Indemnity Co.,* 933 F.2d 1162 (3d Cir.1991).

However, defendants contend that they were not actually aware of an occurrence until December, 1990, when they were notified by the EPD and the EPA that the Trust was a potentially responsible party. This was the first time that they learned that former owners of the Byron property were liable for cleanup costs. Therefore, they contend that the damage did not manifest itself until 1990, well within the 1988 policy period.

The court is unpersuaded by this argument. The EPD investigated the Byron property on April 10, 1987, and determined that PMI had committed numerous violations of the Georgia Hazardous Waste Management Act. PMI was ordered to clean up the wastes on the property by September, 1987. Defendant McCord became aware of the hazardous waste problems on the property during the summer of 1987.

The property was then conveyed to Concrete Sales in September, 1987. The Trust is the sole stockholder of the corporation, defendant McCord is president, and defendant Coody is secretary. In May, 1988, the EPD notified Concrete Sales of its potential liability for cleanup costs under state and federal law. Defendant McCord, as president of Concrete Sales, then took part in extensive negotiations with EPD officials concerning the cleanup of the Byron property during 1988. Concrete Sales was represented by counsel during the negotiation process.

Hence, there is no doubt that defendants McCord and Coody knew of the extensive hazardous waste problems, or occurrences, on the Byron property before the Trust obtained insurance on the property in Janu-

ary, 1989. The fact that they did not know that the Trust was a potentially responsible party for the contamination is irrelevant. There was no occurrence of contamination on the Byron property after September, 1987, and the environmental damage had manifested itself before defendants obtained the 1988 policy.

The court notes that there are cases holding that the "manifestation of injury" for purposes of determining when an occurrence triggers coverage in environmental cleanup cases does not occur until the insured receives notice that it is a potentially responsible party ("PRP"). *See, e.g., Liberty Mutual Insurance Co. v. Triangle Industries, Inc.,* 765 F.Supp. 881 (N.D.W.Va.1991), *aff'd,* 957 F.2d 1153 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992).

However, these cases are distinguishable from the case at bar because they do not involve parties with as much knowledge of the hazardous waste contamination as defendant McCord. For example, in *Liberty Mutual,* the insured had transported hazardous waste to a landfill for disposal between 1977 and 1980. The state EPA detected contamination at the landfill in 1981, and the federal EPA determined that the landfill was releasing hazardous substances in 1983. *Id.* at 883–884. One year thereafter, the insured was notified of its status as a PRP because it had transported hazardous waste to the landfill. *Id.* at 884. The court found that policies issued between 1981 and the date of the PRP notice provided coverage because the manifestation of the injury to the insured did not occur until the date of the PRP notice. *Id.* at 885.

In the case at bar, defendants had much more extensive knowledge of the environmental damage to the property than the insured party in *Liberty Mutual.* The insured in *Liberty Mutual* was completely unconnected to the contaminated property and had no real way of learning about the contamination except through the PRP notice. In contrast, defendants actively communicated with the EPD concerning the contamination of the property; therefore,

they were intimately connected with all the details. Hence, there is no comparison between the insured in *Liberty Mutual* and defendants in the case at bar. Accordingly, plaintiff is entitled to summary judgment on its claim that it owes no coverage under the 1988 policy.

## II. THE OWNED–PROPERTY EXCLUSION

■ Plaintiff next contends that it owes no coverage under the 1984 policy based upon the owned-property exclusion. This provision states as follows:

This insurance does not apply

(k) to *property damage* to

(1) property owned or occupied by or rented to the insured,

(2) property used by the *insured,* or

(3) property in the care, custody or control of the *insured* or as to which the *insured* is for any purpose exercising physical control. (emphasis in original).

Plaintiff contends that the property damage in this case occurred only upon the Byron property; therefore, the costs to clean up this damage are excluded under the 1984 policy.

However, the general rule in environmental cases refutes plaintiff's contention:

So long as the ... complaint contains allegations that encompass the possibility that off-site contamination exists or that the clean-up was performed to prevent damage to the property of third parties, the owned property exclusion would not be applicable to work done on the property.

*Boyce Thompson Institute v. Insurance Co. of North America,* 751 F.Supp. 1137, 1141 (S.D.N.Y.1990) (emphasis added); *see also Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co.,* 788 F.Supp. 846, 852–53 (D.N.J.1992); *Claussen v. Aetna Casualty & Surety Co.,* 754 F.Supp. 1576, 1578–79 (S.D.Ga.1990).

In this case, the EPA and EPD expressly found that hazardous sludge had contaminated a creek located off-site. In addition, the EPA found that there was a threat of

present and future migration of the contamination to off-site locations. Thus, the owned-property exclusion does not apply to the coverage of at least some of the clean-up costs in this case, and plaintiff is not entitled to summary judgment on this issue.

### III.  THE POLLUTION EXCLUSION

■ Plaintiff contends that defendants are not entitled to coverage under the 1984 policy based upon the pollution exclusion. Under this exclusion, insurance does not apply:

[T]o *bodily injury* or *property damage* arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental. (emphasis in original).

Plaintiff claims that the contamination on the Byron property was not "sudden and accidental;" therefore, the pollution exclusion applies.

In *Claussen v. Aetna Casualty & Surety Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989), the Georgia Supreme Court held that the phrase "sudden and accidental" means "unexpected and unintentional." Since the contamination on the Byron property was not discovered until 1987, this court cannot find as a matter of law that the contamination was unexpected and unintentional during the policy period of the 1984 policy. Thus, plaintiff is not entitled to summary judgment on this issue.

### IV.  MISREPRESENTATION IN OBTAINING 1988 POLICY

As the court has already found that defendants are not entitled to any coverage under the 1988 policy, it is unnecessary to address this issue.

### V.  FAILURE TO GIVE REASONABLE NOTICE

Plaintiff contends that defendants failed to give notice of the "occurrence" on the Byron property within a reasonable time. They base this contention on the following provision in the 1984 policy:

(a) In the event of an *occurrence*, written notice containing particulars sufficient to identify the *insured* and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the *insured* to the company or any of its authorized agents as soon as practicable. (emphasis in original).

In this case, it is undisputed that defendants did not give notice of a potential claim resulting from the contamination on the Byron property to plaintiff until December 31, 1990. This notice occurred more than three years after defendants first learned of the contamination on the Byron property. Plaintiff contends that this delay is unreasonable under Georgia law.

Defendants, in contrast, contend that notice in this case was reasonable. They claim that they were not aware of the potential liability of the Trust until December, 1990, when they received notices from the EPA and EPD that the Trust was a potentially responsible party. Thus, according to defendants, there was no delay at all in giving notice to plaintiff.

■ Under Georgia law, the determination of whether notice of an occurrence was "as soon as practicable" is generally a question for the jury. *Richmond v. Georgia Farm Bureau Mutual Insurance Co.*, 140 Ga.App. 215, 231 S.E.2d 245 (1976). However, if "[u]nder all of the facts and circumstances, ... it may be found that an insured's delay in giving notice of an accident to this insurer was unjustified and unreasonable, ... the court may rule on the question as a matter of law." *Id.* at 220–21, 231 S.E.2d 245.

■ In this case, defendants first became aware of the environmental contamination on the Byron property in the summer of 1987 and did not notify plaintiff of any potential liability from this contamina-

tion until December, 1990. However, defendants offer as justification for their delay the fact that they were unaware of the Trust's potential liability until notification by the EPA and the EPD in December, 1990.

The court cannot find as a matter of law that defendants should have known of the Trust's potential liability prior to notification by the EPD and EPA. Thus, there is a dispute of fact on the issue of reasonable notice that should be determined by a jury, and summary judgment is not appropriate. *See Insurance Co. of North America v. Waldroup,* 462 F.Supp. 161, 163 (M.D.Ga. 1978).

### CONCLUSION

In conclusion, the court GRANTS plaintiff's motion for summary judgment IN PART and DENIES it IN PART. Plaintiff's motion for summary judgment is GRANTED on the question of coverage under the 1988 policy. The court HOLDS that plaintiff owes no obligation to defendants under this policy. However, as there are several disputes of fact remaining on the question of coverage under the 1984 policy, plaintiff's motion for summary judgment on this policy is DENIED.

SO ORDERED.