999 F.2d 1547
 CANADYNE-GEORGIA CORPORATION, Plaintiff-Counter-Defendant, Appellant,
v.
CONTINENTAL INSURANCE COMPANY, Defendant-Counter-Claimant, Appellee,
American Universal Insurance Company, et al., Defendants-Appellees.
 No. 92-8547.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 8, 1993.
 
 V. Robert Denham, Jr., Powell, Goldstein, Frazer & Murphy, Jeffrey H.E. Schoenberg, Linda G. Birchall, Atlanta, GA, Leon B. Kellner, Anderson, Kill, Olick & Oshinsky, P.C., Washington, DC, for appellant.
 Brian P. Turcott, Fellows, Johnson, Davis & La Briola, Carey Micheal Johnson, George Terrell Davis, Atlanta, GA, for Continental.
 Steven A. Miller, Drew, Eckl & Farnham, Richard T. Gieryn, Kevin E. Wolff, McElroy, Deutsch & Mulbaney, Morristown, NJ, for U.S. Fire Ins.
 Ben L. Weinberg, Jr., Long, Weinberg, Ansley & Wheeler, Frederick N. Sager, Jr., Atlanta, GA, Maurya Crawford Keating, Wilson, Elser, Moskowitz, Edelman & Dicker, Eileen B. Eglin, New York City, for Northwestern Nat. Ins. Co.
 Warner S. Fox, Freeman & Hawkins, Frank C. Bedinger, III, Atlanta, GA, for Admiral Ins. Co.
 Stephen E. O'Day, Atlanta, GA, Mark W. Kinzer, Smith Gambrell & Russell, James P. Schaller, Jackson & Campbell, P.C., Antoinette Patterson LeBel, Washington, DC, for Lexington Ins. Co.
 Vincent J. De Stefano, Jr., German, Gallagher & Murtaugh, Michael D. Gallagher, Philadelphia, PA, Robin L. Frazer, Swift, Currie, McGhee & Hiers, Atlanta, GA, for Stonewall Ins. Co.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH and HATCHETT, Circuit Judges, and ATKINS*, Senior District Judge.
 HATCHETT, Circuit Judge.
 
 
 1
 In this lawsuit arising out of claims of contamination of the environment, we affirm the district court's summary judgment ruling that the appellant failed to give timely notice to insurers as the insurance policies required.
 
 FACTS
 
 2
 This action involves a chemical manufacturing and formulating plant in Fort Valley, Georgia, and stems from the pesticide and chemical contamination at the Fort Valley Plant site and the Peach County Landfill site in Powersville, Georgia, where the plant deposited waste over the years. The Environmental Protection Agency (EPA) placed both sites on its National Priorities List pursuant to the "Superfund" Program. Canadyne-Georgia Corporation, the appellant, filed the instant lawsuit against various insurance companies which issued policies to Canadyne covering the years from 1965 through 1984, for liability resulting from contamination of the surrounding environment.[1] Canadyne seeks review of the district court's summary judgment in favor of appellees for Canadyne's failure to give timely notice to appellees pursuant to the policies.
 
 
 3
 The Woolfolk Chemical Works, Inc. operated the Fort Valley Plant from December, 1972, until July, 1977, when Reichhold Chemicals, Ltd. acquired all stock of Woolfolk. From mid-1977 until mid-1984, the Fort Valley Plant was under the corporate structure of Reichhold. In June, 1984, Woolfolk changed its name to Canadyne-Georgia Corporation and Reichhold sold most of the assets of Canadyne to another corporation. Initially, the plant was constructed to produce a line of lead- and arsenic-based products used to support cotton growers. Production expanded in the 1950s to include the formulation of various organic pesticides, including DDT, Lindane, Toxaphene, and other chlorinated organics.
 
 
 4
 The policies at issue include both primary policies and excess or umbrella policies. Canadyne sets forth the language typical of the primary policies concerning notice:
 
 
 5
 In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place, and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
 
 
 6
 The policies define the term "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended [by the] insured." "Property damage" means "physical injury to or destruction of tangible property ... including the loss of use thereof...." The primary policies exclude coverage for damage to property the insured owns, uses, or controls.
 
 
 7
 The excess/umbrella policies provide coverage only upon exhaustion of Canadyne's underlying insurance coverage. The excess/umbrella policies require the insured to give "prompt written" notice upon knowledge that an "occurrence presents the potential that [the insurer] may be liable."[2]
 
 
 8
 Canadyne also carried environmental impairment liability (EIL) insurance. These policies covered
 
 
 9
 costs and expenses of operations designed to remove, neutralize or clean up any substance released or escaped which had caused ... or could cause Environmental Impairment if not removed, neutralized or cleaned up, to the extent that such costs and expenses ... have become payable by the Insured either in the endeavor to avert or reduce a loss covered by this Policy or for operations outside the Insured's premises as a result of legal obligation....
 
 Fort Valley Plant Site
 
 10
 Mr. Thurmond began work at the Fort Valley plant in 1947 as plant engineer and became vice president in charge of production in 1972. Thurmond testified that from 1947 through 1983, exhaust fans at the plant would vent pesticide dust material directly out of the buildings, and he recalled dust two inches thick accumulating in places in the pesticide formulation buildings. Thurmond acknowledged that the installation of dust collection equipment did not prevent dust from escaping and getting into the atmosphere, and that this dust accumulation outside the buildings was subject to rainwater wash-off into the soil. Thurmond testified that pesticide dust residue would fall through the wooden floors in the buildings into the ground underneath. Thurmond testified that workers at the plant rinsed out drums containing technical pesticide products, and the runoff would enter into a drainage ditch running along the property. Thurmond stated that pesticide Toxaphene would spill because of overflow of the Toxaphene storage tanks. Thurmond testified to receiving a letter dated March 16, 1971, from the State Water Quality Control Board notifying Canadyne that the state's inspection of the plant revealed the sources of pollution from the plant to be (1) drum washing operations, (2) surface drainage, (3) spills and tank overflows. Thurmond acknowledged that pollution was a concern of the Water Quality Control Board because these toxic substances traveled off-site.
 
 
 11
 Thurmond testified that in the early 1980s, the EPA characterized the materials handled at the plant as hazardous waste, and Woolfolk did not dispute such characterization of the materials. Thurmond acknowledged that during the early 1980s, the EPA characterized arsenic, Lindane, Toxaphene, Chlordane, and DDT as hazardous waste, and Canadyne knew that the EPA banned DDT and Chlordane from sale and Lindane and Toxaphene for certain uses.
 
 
 12
 Mr. Cleveland, former plant manager, testified that operations at the plant were dusty, and dust containing pesticides would get blown and tracked outdoors. Cleveland acknowledged that incidental spills of pesticide products occurred in the day-to-day formulation process, and personnel at the plant rinsed drums containing residue of technical pesticides, and the runoff from such rinsing proceeded into drainage ditches.
 
 
 13
 In 1982, Canadyne hired an environmental consulting firm, Dames and Moore, which informed Canadyne that arsenic, lead, and zinc existed in the shallow groundwater at the plant site, and the levels exceeded the water quality standards. Canadyne subsequently hired another environmental consultant, Clayton Environmental. Clayton Environmental, after installing wells to test the groundwater, discovered significant contamination in the groundwater at the plant site. Thereafter, Canadyne retained the services of the law firm of Powell, Goldstein, Frazer, and Murphy to represent the company on environmental and insurance matters. Canadyne also notified the EPA and the Georgia Environmental Protection Division (EPD) of the Department of Natural Resources (DNR) that the groundwater at the plant site was contaminated with hazardous waste incidental to the production process.
 
 
 14
 On June 26, 1984, Canadyne and Reichhold notified its EIL carrier of the plant site contamination. On February 26, 1985, attorneys for Canadyne wrote Canadyne's EIL broker, the London Agency, and enclosed a letter from the EPD stating that the plant site was a candidate for inclusion on the EPA's National Priorities List, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9605 (1993).
 
 
 15
 During this time period, Canadyne was in the process of selling its plant. In Canadyne's First Amendment to Purchase Agreement (purchase agreement) with Security Chemical Company dated August 2, 1984, it states that "groundwater sampling has also been conducted by Clayton at certain wells located on the site and in surrounding areas.... It is acknowledged that such testing indicates both soil and groundwater contamination at certain locations tested." Pursuant to the purchase agreement, Canadyne agreed to indemnify, to defend, and hold the purchaser harmless from and against all actions, costs, and expenses arising out of soil or groundwater contamination at the plant site.
 
 
 16
 In early 1985, Canadyne retained the services of another environmental consultant, Applied Engineering and Science (AES). AES conducted additional investigations of the problems at the plant site. AES states in its summary report dated April, 1986, that
 
 
 17
 deep soil contamination at [the plant site] is the probable source for contamination found in the upper aquifer. The upper aquifer is separated locally from the lower aquifer by a kaolin clay layer. The lower aquifer serves as the city of Fort Valley water supply.... However, the two aquifers may be interconnected at some point....
 
 
 18
 Mr. Harper, a previous employee of AES, testified that Clayton Environmental discovered residual contamination in the surface soils directly west of the plant site, the contaminant being arsenic. Harper testified that this investigation occurred in 1984, and it was in 1985 that AES discovered this finding. Harper stated that Canadyne's attorneys provided AES with the Clayton Environmental report indicating off-site contamination.
 
 
 19
 On September 6, 1984, EPD representative David Brackett sent a draft work sheet used to analyze and rank contamination at the plant site to Canadyne's attorneys. The draft work sheet stated that Canadyne is a pesticide formulator whose production procedures have resulted in "significant spillage of metals, organic pesticides and chlorinated hydrocarbons. This spillage has resulted in significant contamination of soils and shallow groundwater in areas around the facility." Mr. Surowieck, on behalf of EPD, directed a letter to Canadyne's attorneys dated February, 1985, advising them that significant levels of hazardous materials had migrated off-site. The letter states that
 
 
 20
 the samples of soil taken adjacent to the [plant site] indicate that significant levels of hazardous constituents have migrated off-site.... The surface water leaving the site through the storm and sanitary sewer system contains unacceptably high concentrations of hazardous constituents.... Three of [the seven on-site wells] indicate heavily contaminated groundwater existing under the site.... The groundwater contamination problem is exacerbated by the close proximity of the three, large capacity, municipal water supply wells.... This soil contamination has resulted in a significant release of hazardous constituents into the surface and groundwater system. Both of these systems have a great potential to impact the local population....
 
 
 21
 Surowieck reported that at a meeting held on October 25, 1985, at which officers and attorneys for Canadyne attended and which the DNR recorded, Surowieck discussed the findings at the plant site of lead concentrations above drinking water standards and low levels of DDT and Toxaphene in the deep aquifer.
 
 
 22
 Mr. Boyer of AES testified that small concentrations of Lindane and Chlordane were found in the deep aquifer at the plant site, and that AES reported this information to Canadyne's attorneys in December, 1985.
 
 
 23
 Mr. Douglas, an officer at Canadyne and Reichhold, prepared an interoffice memorandum on April 30, 1986, and stated that "testing of deep monitor wells indicates some contamination in lower aquifer that feeds city water wells." Douglas also states that one of the company's key actions should be to "accelerate work on insurance recovery."
 
 
 24
 In the spring of 1986, Canadyne and Reichhold developed a plan to clean-up the plant site in the hopes that the EPA would not place the plant site on the National Priorities List. AES commenced remediation of the plant site in September, 1986, and completed initial clean-up on April 1, 1987, at a cost of approximately $2,350,000.
 
 
 25
 On September 19, 1986, EPA directed a letter to Canadyne stating that it was to investigate the release or threatened release of hazardous substances at the plant site. On July 7, 1987, the EPA informed Canadyne's attorneys that the "EPA has reason to believe that there may be a release or threat of a release of hazardous substances from the site into the surrounding environment."
 
 
 26
 Mr. Harper of AES testified that investigations discovered Lindane in the lower aquifer and that, in 1986, AES and Canadyne discussed how the Lindane got to the lower aquifer. On January 13, 1988, Harper sent Reichhold a letter confirming that investigations at the plant site uncovered groundwater contamination in the deep aquifer at the site. Contamination included concentrations of arsenic, lead and Lindane.
 
 
 27
 On June 28, 1988, Canadyne's attorneys wrote Mr. Bodrug, officer at Canadyne and Reichhold, informing him that the June 24, 1988, Federal Register announced EPA's proposal to add the plant site to the National Priorities List.
 
 
 28
 The appellees received first notice of any claim or occurrence regarding the plant site by letter of Canadyne through its attorneys dated no earlier than October 6, 1989.
 
 Powersville Site
 
 29
 The Powersville Municipal Landfill originated as a gravel borrow pit during the 1940s, and it is unclear exactly when the gravel pit converted to a municipal landfill. It is also unclear when Canadyne began dumping hazardous waste in the municipal landfill. An EPD report prepared on October 24, 1972, indicates that Canadyne dumped between 200 to 300 twenty-five pound bags of pesticide at the Powersville site at one time in 1972. The report indicates that possible hazards may occur, including the contamination of the groundwater underneath the site. The report documented the type of hazardous waste dumped onto the bare ground at the Powersville site. The majority of the bags contained either 7 1/2 percent Sevin dust or 2 percent Dieldrin dust. Lesser quantities included fifty-pound bags of ten percent DDT. Mr. Barefoot, a DNR representative, testified that he was sure that Canadyne knew in 1972 of the concern of underground water contamination.
 
 
 30
 Mr. Thurmond of Canadyne testified that Canadyne and the municipal landfill established a special hazardous waste area because of concerns of groundwater contamination as a result of Canadyne's dumping of waste on bare ground at the site. Thurmond acknowledged that the DNR expressed its concern in December, 1972, that Canadyne's dumping of pesticide on the bare ground could lead to groundwater contamination in the area. Canadyne paid for the construction of the hazardous waste disposal area at the site built during the summer of 1973. Thurmond admitted that the DNR instructed Canadyne to not dump any hazardous waste in the general municipal landfill area. However, Mr. Surowieck, with the EPD, testified that he recalls visiting Canadyne's plant manager, Thurmond, in 1979 and informing him that EPD was not pleased that Canadyne still disposed of hazardous waste in the general municipal landfill area, and warned Canadyne that any hazardous pesticides disposed on the bare soil could contaminate the Tuscaloosa Aquifer.
 
 
 31
 Thurmond testified that a fence contained the Powersville hazardous waste area and that he did not know of any other entity with a key allowing access to the hazardous waste area, nor could he recall Canadyne giving permission to any other company to dump hazardous waste at the site.
 
 
 32
 On June 9, 1983, EPD in a letter informed Canadyne that it was investigating Canadyne's past disposal of hazardous waste at the Powersville site to assess health hazards. In the fall of 1983, Canadyne was on notice of groundwater contamination at the Powersville site and that the contamination was of hazardous chemicals of the same nature that Canadyne dumped at the site. Multiple newspaper reports came out during the fall of 1983 regarding groundwater contamination at the Powersville site resulting from Canadyne's dumping of its hazardous waste. As a result of sampling wells near the Powersville site in 1983, the EPA placed the site on its National Priorities List in September, 1983, and Canadyne knew of such placement in October, 1983.
 
 
 33
 Mr. Young, former president of Canadyne, testified that he learned in 1983 that the water at the Lizzie Chapel Church located adjacent to the Powersville site was contaminated. Young acknowledged that this made him concerned that church members might file a lawsuit against Canadyne.
 
 
 34
 Mr. Bodrug of Canadyne testified that these events concerning contamination at the Powersville site led Canadyne to give notice to its EIL insurer by letter dated October 14, 1983. In its letter, Canadyne states that "[p]reliminary testing of one drinking well near [the Powersville site] resulted in EPA's warning to the owner to cease use of this particular well until further testing could be done."
 
 
 35
 On September 27, 1984, the EPA sent Canadyne notice that the EPA considered Canadyne a potentially responsible party pursuant to CERCLA for the contamination at the Powersville site. EPA letter dated November 20, 1984, stated that EPA determined that "a release of hazardous substances ... has occurred at the [Powersville site]. At the present time, toxic metals, and pesticides, are contaminating the groundwater." Mr. Douglas of Canadyne prepared an interoffice communication dated July 31, 1985, in which he reports that the Powersville site is "said to be contaminating nearby drinking water," and that the site is "an EPA superfund site on national priority list."
 
 
 36
 Canadyne first notified the appellees on January 16, 1986, of a claim or occurrence regarding the Powersville site.
 
 PROCEDURAL HISTORY
 
 37
 Canadyne filed this lawsuit on December 17, 1990, in Fulton County Superior Court in the state of Georgia. On January 17, 1991, the appellees, Continental Insurance Company, American Universal Insurance Company, Admiral Insurance Company, Northwestern National Insurance Company, Lexington Insurance Company, Stonewall Insurance Company, and United States Fire Insurance Company, removed the case to federal district court in the Northern District of Georgia, Atlanta Division.
 
 
 38
 Canadyne seeks a declaratory judgment that the appellees' insurance policies issued to Canadyne provide coverage for Canadyne's defense costs and damages incurred in connection with the plant site and the Peach County Landfill. Canadyne also seeks a declaratory judgment that the insurance policies require the appellees to provide a defense to Canadyne in connection with environmental enforcement activities of the EPA and the Georgia Environmental Protection Division of the Department of Natural Resources. Canadyne also seeks reimbursement of its costs and attorney's fees incurred in connection with the government enforced activities and penalties for appellees' bad faith refusal to provide coverage for Canadyne's costs.
 
 
 39
 On January 8, 1992, American Universal moved the court to dismiss the lawsuit against it. On January 10, 1992, the appellees jointly moved the court for summary judgment. On March 17, 1992, the district court granted American Universal's motion to dismiss. On May 1, 1992, the district court granted the appellee's joint motion for summary judgment, and on May 8, 1992, the district court entered judgment against Canadyne and dismissed its action.
 
 
 40
 The district court found that the evidence was clear that
 
 
 41
 Canadyne knew or should have known from the numerous studies, warnings, and other events undertaken throughout the 1980s that (1) the pesticide contamination making its way through the soil and into the groundwater at both the Fort Valley site and at the Powersville site could cause extensive property damage both on and off-site; and (2) that Canadyne would most likely be responsible for the clean-up of that contamination.
 
 
 42
 The district court held that no genuine issue of material fact existed as to whether Canadyne timely notified the appellees of the "occurrences" taking place at the two contamination sites, and therefore, summary judgment was proper. The district court concluded that Canadyne's notices to appellees of the "occurrences" at the Fort Valley site and the Powersville site were untimely and unreasonable as a matter of law.
 
 
 43
 The district court rejected Canadyne's request that the court hold that an insurance company cannot deny coverage for the insured's failure to provide timely notice unless the insurance company can show prejudice as a result of the delay in notice. The district court cited to Georgia case law, holding that "prejudice or lack thereof to the insurer is not a factor in assessing whether or not the delay in notice is excusable and the ultimate determination [of whether notice is] reasonable, i.e. 'as soon as practicable.' " Townsend v. National Union Fire Ins. Co., 196 Ga.App. 789, 397 S.E.2d 61 (1990).
 
 
 44
 The district court also found no genuine issues of material fact regarding the issue whether the policies require appellees to reimburse Canadyne for clean-up costs incurred prior to appellees receiving notice of an occurrence. Because Canadyne made the payments without the consent or knowledge of appellees and Canadyne was not under any legal obligation to make the payments, the district court found such payments voluntary. Based on that finding, the district court held that Canadyne failed to comply with the cooperation clause in the policies specifically prohibiting Canadyne from making voluntary payments. Accordingly, the district court found appellees not responsible for any of Canadyne's pre-notice costs.
 
 
 45
 On June 5, 1992, Canadyne appealed the district court's judgment.
 
 CONTENTIONS
 
 46
 Canadyne contends that the district court erred in granting summary judgment for the appellees. Canadyne contends that it gave timely and reasonable notice to the appellees of the "occurrences" and "claims" involving the plant site and Powersville site. Canadyne asserts that the policies do not require notice until Canadyne knows that an occurrence damages the property of some potential claimant or upon receipt of a "claim." Canadyne contends that the appellees failed to provide a date on which damage to third party claimant's property occurred or establish that Canadyne knew of such damage prior to giving notice of an occurrence, and therefore, a genuine issue of material fact exists as to when such an occurrence took place. Canadyne contends the district court failed to identify the "occurrences" and "claims" in this case and that, at the least, this court should vacate the decision below and remand for the district court to provide its reasons in support of summary judgment.
 
 
 47
 Canadyne contends that because appellees have suffered no prejudice from the delayed notice, this court should not deprive Canadyne of insurance coverage. Canadyne contends that the Georgia Supreme Court has not ruled on the issue whether an insurance company must demonstrate prejudice in order to achieve a forfeiture of coverage on grounds of late notice, and Canadyne asserts that the Georgia Supreme Court would adopt "the clear majority view that even untimely notice does not relieve an insurance company of the coverage obligations, unless the insurance company actually was prejudiced by the untimely notice."
 
 
 48
 Canadyne contends that the appellees' policies should cover the sums of money Canadyne expended in its effort to limit or mitigate property damage liability prior to notice to the appellees. Canadyne contends that this court should certify the case to the Georgia Supreme Court because no Georgia precedent exists which is squarely on point.
 
 
 49
 The appellees contend that the district court correctly held that Canadyne's notice was untimely and unreasonably delayed as a matter of law. The appellees assert that Georgia law is clear that the insurer need not show prejudice in order to bar coverage for late notice, and therefore, the issue does not merit certification to the Georgia Supreme Court. The appellees contend that Canadyne's pre-notice voluntary payments are at Canadyne's own expense based on the conditions contained in the insurance policies.
 
 ISSUES
 
 50
 This appeal involves the following issues: (1) whether the district court erred in granting summary judgment in favor of appellees, finding that Canadyne's notice to appellees was unreasonable and untimely as a matter of law; (2) whether the district court erred in holding that prejudice to the appellees is not a factor in determining whether Canadyne's unreasonable and untimely notice barred coverage under the subject policies; and (3) whether the district court erred in determining that the appellees are not responsible for any and all of Canadyne's voluntary, pre-notice expenditures.
 
 DISCUSSION
 I. WHETHER SUMMARY JUDGMENT IS PROPER
 
 51
 This is an appeal from the district court's grant of summary judgment. Therefore, this court's review is plenary and we apply the same legal standards as those controlling the district court. Industrial Partners, Ltd. v. CSX Transp., Inc., 974 F.2d 153, 155 (11th Cir.1992). Pursuant to Federal Rules of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions of record, with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). For the reasons that follow, we affirm the district court's summary judgment in favor of appellees.
 
 
 52
 The policies at issue require Canadyne to provide prompt notice to appellees as soon as practicable after an "occurrence"; an "occurrence" being "an event of property damage ... likely to give rise to a claim."[3] The purpose of the notice provision is to "enable the insurer to investigate promptly the facts surrounding the occurrence while they are still fresh and the witnesses are still available, to prepare for a defense of the action, and, in a proper case, to determine the feasibility of settlement of the claim." Richmond v. Georgia Farm Bureau Mut. Ins. Co., 140 Ga.App. 215, 231 S.E.2d 245, 250 (1976). And, while the question whether the insured met the notice condition is usually a question for the jury, "an unexcused significant delay may be unreasonable as a matter of law." E.g., Townsend v. National Union Fire Ins. Co., 196 Ga.App. 789, 397 S.E.2d 61, 62 (1990). The facts establish that Canadyne unreasonably delayed notification.
 
 Fort Valley Plant Site
 
 53
 The former plant engineer at the Fort Valley plant, Mr. Thurmond, testified to the extensive contamination of soil and groundwater at the plant resulting from normal operations. Thurmond testified that as early as 1971, Canadyne knew that the state of Georgia believed a problem existed of serious hazardous pollution "leaving the site premises." Two environmental consulting firms confirmed the existence of extensive groundwater contamination at the site. Canadyne notified the EPA and EPD of the hazardous waste problem. In its purchase agreement with Security Chemical Company, Canadyne acknowledged that testing performed at the plant site and in surrounding areas indicated "both soil and groundwater contamination." Thus, the district court is correct that as of 1984, Canadyne knew of serious contamination problems at the plant site.
 
 
 54
 In 1984, Canadyne notified its EIL insurer of the plant site contamination. In 1985, Canadyne knew that the plant site was a candidate for inclusion on the National Priorities List. In 1985, Canadyne learned from a third consulting firm, AES, that the deep aquifer, a water supply for the city of Fort Valley, was at risk of contamination as a result of plant operations. Mr. Harper of AES testified that in 1985, Canadyne's attorneys provided AES with the Clayton Environmental report which indicated arsenic contamination of surface soil directly west of the plant site.
 
 
 55
 In 1985, Mr. Surowieck of EPD directed a letter to Canadyne advising it that significant levels of hazardous materials had migrated off-site. The letter states that the "soil contamination has resulted in a significant release of hazardous constituents into the surface and groundwater system. Both of these systems have a great potential to impact the local population." Surowieck also reported Canadyne's knowledge of the discovery of low levels of DDT and Toxaphene in the deep aquifer at the plant site in 1985. Mr. Boyer of AES testified that Canadyne's attorneys learned of small concentrations of Lindane and Chlordane in the deep aquifer at the plant site in 1985. Moreover, a Canadyne interoffice memorandum, dated April 30, 1986, indicated contamination of the lower aquifer which "feeds city water wells."
 
 
 56
 In 1986, Canadyne hired AES to clean up the plant site in the hope that the EPA would not place the site on its National Priorities List. AES completed the initial clean-up on April 1, 1987, at a cost of $2,350,000. In September 1986, EPA notified Canadyne of its intent to investigate the release of hazardous substances at the plant site. Later, in June 1988, EPA announced its proposal to add the site to the National Priorities List.
 
 
 57
 Despite this knowledge, Canadyne failed to give appellees notice of an "occurrence" until October 6, 1989. Canadyne knew that its operations resulted in property damage to soil and groundwater off-site. See, e.g., South Carolina Ins. Co. v. Coody, 813 F.Supp. 1570, 1575 (M.D.Ga.1993) ("it is clear that contamination of property by hazardous waste is physical injury to tangible property"). By 1986, Canadyne knew of the property damage likely to give rise to a claim, because investigations revealed serious hazardous contamination off-site and in the deep aquifer at the plant site, which was a source of city drinking water. At the latest, Canadyne should have notified appellees of the contamination in 1986 when it decided to hire AES to undertake the clean-up of the plant site. The extensive hazardous contamination in the soil and groundwater on and off-site was an "occurrence" within the meaning of the policies.
 
 Powersville Site
 
 58
 An EPD report prepared in 1972 showed that Canadyne dumped 200 to 300 twenty-five pound bags of pesticide at the Powersville site, and that contamination of the groundwater may occur because of such dumping. Mr. Surowieck with the EPD warned Canadyne in 1979 that Canadyne's continued dumping of hazardous waste onto the bare ground at the Powersville site could contaminate the Tuscaloosa Aquifer. The EPA, as a result of well sampling near the Powersville site, placed the site on its National Priorities List in 1983, of which Canadyne was aware. Mr. Young, then president of Canadyne, learned in 1983 that the water at the Lizzie Chapel Church located adjacent to the site was contaminated. Multiple newspaper reports came out in 1983 speaking of the groundwater contamination resulting from Canadyne's dumping of its hazardous material at the site.
 
 
 59
 Mr. Bodrug of Canadyne testified that these events led Canadyne to notify its EIL insurer in a letter dated October 14, 1983. The letter stated that "[p]reliminary testing of one drinking well near [the Powersville site] resulted in the EPA's warning to the owner to cease use of this particular well until further testing could be done." In September 1984, the EPA sent Canadyne notice that Canadyne was a potentially responsible party for the contamination at the site. In November 1984, the EPA sent Canadyne a letter which stated that "a release of hazardous substances ... has occurred at the [Powersville site]. At the present time, toxic metals, and pesticides, are contaminating the groundwater." Mr. Douglas of Canadyne sent an interoffice communication dated July 31, 1985, in which he reports that the Powersville site is "said to be contaminating nearby drinking water" and that the site is "an EPA superfund site on national priority list."
 
 
 60
 Despite this information, Canadyne prolonged notifying appellees of an "occurrence" at the Powersville site until January 16, 1986. Canadyne knew that property adjacent to, and nearby, the Powersville site was damaged. Canadyne knew enough to notify its EIL insurer in 1983. Mr. Young of Canadyne testified that in 1983, the off-site drinking water contamination made him concerned that church members would file a lawsuit against Canadyne. Canadyne should have notified appellees in 1983 after (1) the EPA placed the site on its National Priorities List as a result of well sampling near the site, (2) the EPA warned against use of a nearby drinking well, and (3) the water at the Lizzie Chapel Church was determined to be contaminated. The groundwater contamination on and off-site was an "occurrence" within the meaning of the policies. See Coody, 813 F.Supp. at 1575.
 
 
 61
 No genuine issue of material fact exists whether Canadyne complied with the notice provisions. We find that, as a matter of law, Canadyne failed to comply with the notice provisions of the policies. The policies require prompt notice as soon as practicable after an "occurrence." At the latest, Canadyne should have notified appellees of the problems at the plant site no later than September, 1986, a full three years prior to when Canadyne actually gave notice. As regards the Powersville site, Canadyne should have given notice to appellees, at the latest, in the fall of 1983, more than two years prior to the time Canadyne actually gave notice. Canadyne's failure to comply with the notice provisions bars recovery under the policies and summary judgment in favor of appellees is proper. E.g., Protective Ins. Co. v. Johnson, 256 Ga. 713, 352 S.E.2d 760 (1987) (17-month delay in giving insurer notice unreasonable as a matter of law and bars insured from recovery under policy); Caldwell v. State Farm Fire & Cas. Ins., 192 Ga.App. 419, 385 S.E.2d 97 (1989) (notice six months after service of summons unreasonable as a matter of law, precluding recovery). Our holding necessarily disposes of the issue whether appellees are responsible for Canadyne's pre-notice expenditures.
 
 II. PREJUDICE TO INSURER
 
 62
 Canadyne contends that the Georgia Supreme Court has not ruled on the issue whether an insurance company must demonstrate prejudice in order to achieve a forfeiture of coverage on the grounds that the insured failed to comply with the notice provision in the policy. Upon review of Georgia caselaw, we find Georgia law clear on this issue. In Protective Ins. Co. v. Johnson, 352 S.E.2d at 760, the Georgia Supreme Court ruled that a 17-month delay in notice was unreasonable as a matter of law and held the insured "barred from collecting benefits from Protective Insurance Company." Johnson, 352 S.E.2d at 761. The Court made no mention of a requirement of prejudice to the insurer resulting from the delayed notice in order to bar recovery under the policy.
 
 
 63
 The Georgia Court of Appeals repeatedly confirms the rule in Georgia that an insurer need not prove prejudice in order to avoid paying benefits to the insured who fails to comply with the notice provision in the policy. In Townsend, the court stated that "prejudice or the lack thereof to the insurer is not a factor in assessing whether or not the delay in notice is excusable...." Townsend, 397 S.E.2d at 63. See also Caldwell v. State Farm Fire & Cas. Ins., 385 S.E.2d at 99 ("State Farm is not required to show that it was prejudiced by the failure to give notice where the requirement is, as here, a valid condition precedent to coverage"); Richmond v. Georgia Farm Bureau Mut. Ins. Co., 231 S.E.2d at 250 ("there is no need for an insurer to prove it was prejudiced by an insured's failure to give notice"). The district court correctly determined Georgia law. The appellees need not show prejudice to prevail.
 
 CONCLUSION
 
 64
 For the reasons set forth above, we hold that the district court properly entered summary judgment in favor of appellees and we affirm the district court.
 
 
 65
 AFFIRMED.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 We refer to any and all operators of the Fort Valley plant site as "Canadyne" and to all defendant/appellee insurance companies as "appellees."
 
 
 [2]
 According to Canadyne, each underlying (primary) policy provided at least $500,000 of coverage. We find that Canadyne knew that the contamination at both sites and in the surrounding areas presented the potential that the excess/umbrella insurers would become liable. The contamination was of such magnitude that at the time Canadyne should have given notice to the primary insurers, it should also have given notice to its excess/umbrella carriers
 
 
 [3]
 Canadyne contends that any delay in giving notice which resulted from its mistaken belief concerning the requirements of the policies raises a question for the jury whether such delay was reasonable. Whether this is true is irrelevant because the alleged "misapprehension of the scope" of coverage was not a misapprehension after all. Canadyne asserts that it viewed the policies at issue as requiring it to give notice once it knew of "property damage to the property of another which it believed was not excluded from coverage." We find that Canadyne knew of property damage to another not excluded from coverage well before Canadyne gave notice, and that such delay in notification was unreasonable