**SCRIPPS CLINIC AND RESEARCH FOUNDATION and Revlon, Inc., Plaintiffs,**

**v.**

**GENENTECH, INC. and Miles Laboratories, Inc., Defendants.**

**No. C–83–5423–WWS.**

United States District Court, N.D. California.

Feb. 5, 1988.

---

Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Eugene Moroz, William S. Feiler, Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiffs.

Bradford J. Duft, James W. Geriak, Douglas E. Olson, Lyon & Lyon, Los Angeles, Cal., Richard Haas, Janet Morgan, Lasky, Haas, Cohler & Munter, San Francisco, Cal., Bertram Bradley, James A. Giblin, Berkeley, Cal., Arnold Sprung, Nathaniel D. Kramer, Sprung, Horn, Kramer & Woods, New York City, for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

Before the Court is defendant Genentech, Inc.'s ("Genentech") motion for reconsideration of this Court's prior ruling, granting plaintiff Scripps Clinic and Research Foundation's ("Scripps") motions for partial summary judgment. That ruling is reported at 666 F.Supp. 1379 (N.D. Cal.1987); and because it states the relevant facts fully, they will not be repeated here.

### I. *Claim Interpretation and Infringement*

As the first ground for its motion for reconsideration, Genentech contends that genuine issues of material fact exist regarding the interpretation of Patent No. 4,361,509 ('509 Patent) that precludes granting partial summary judgment. It advances several arguments under this head which the Court will address seriatim.

To begin with it is necessary to recall what the Court's prior ruling decided. So

far as relevant here the Court decided two issues:

1) On the issue of claim interpretation, the Court decided that human Factor VIII:C as claimed in the patent applies to any Factor VIII:C preparation, regardless of how it is produced, having the same material structural and functional characteristics as the plasma-derived preparation. 666 F.Supp. at 1390.

2) On the issue of infringement of the product claims, the Court held that Genentech infringed claims 24, 25, 28 and 29 by its production of plasma-derived and recombinant Factor VIII:C. 666 F.Supp. at 1395.

Genentech's memorandum obscures and confuses the distinction between those two issues and accordingly, like some of its prior papers in this action, is less than helpful to the Court. Genentech rests its argument directed at claim interpretation on the Court's reasoning directed at infringement, necessarily leaving the argument with little force and credibility. *See, e.g.,* Def.Mot. re Infringement at 3, lines 5–18; 6, lines 12–16; 8, lines 9–13. It is difficult to escape the conclusion that Genentech either does not understand the Court's prior ruling or is misconstruing it, misleading the Court.

**A. Claim Interpretation**

There is no dispute that claim interpretation is a question of law. 666 F.Supp. at 1386. It is no less a question of law if the testimony of experts is received and considered by the Court as an aid to interpretation. *See Tillotson, Ltd. v. Walbro Corp.,* 831 F.2d 1033, 1039 (Fed. Cir.1987). Moreover, the mere fact that a dispute exists over interpretation does not create a triable issue of fact. If that were not so, the Court could never decide an issue of interpretation.[1]

The Court received and considered the testimony of Drs. Katzmann and Zimmerman on the issue of interpretation. 666 F.Supp. at 1380. Contrary to the implication of Genentech's argument, Def.Mot. re Infringement at 6, the Court did not rule the testimony not "relevant," it simply found it not persuasive. Genentech was not precluded from offering the Court that, or any additional testimony to support its interpretation of the claims. What it chose to offer was sparse, at best, and, in the Court's view, not supportive of Genentech's interpretation, to wit, that the words "human Factor VIII:C," as used in the patent, exclude VIII:C produced through a recombinant process.[2] That Genentech may con-

---

1. *Palumbo v. Don–Joy Co.,* 762 F.2d 969 (Fed. Cir.1985), is distinguishable since the issue there involved equivalence, an issue of fact, in the context of the interpretation of a "means plus function" claim under 35 U.S.C. § 112.

2. Counsel for Genentech did not seek or obtain a direct answer from Dr. Zimmerman to the question whether the claim language was intended to exclude recombinant Factor VIII:C:

Q Did you intend to claim the material which you disclosed in your patent application?

A Correct. Yes.

Q And did you intend to claim recombinant Factor VIII:C?

A We intended to claim human VIII:C.

Q You didn't never mention recombinant VIII:C in your patent application, did you?

A I did not mention recombinant VIII:C in that patent application.

  \*    \*    \*    \*    \*    \*

Q What is porcine VIII:C?

A It's VIII:C purified from pig plasma.

Q And what is bovine VIII:C?

A VIII:C purified from cow plasma.

Q What is human VIII:C?

A VIII:C purified from humans and containing amino acid sequence unique to humans.

Depo. of Zimmerman, vol. I at 123, 130–31.

The questions asked of Dr. Katzmann did not relate to the matter at issue at all:

A. Would you define what attempts you are talking about again for me?

Q. The attempts that you have referred to in the last—second to the last line of paragraph 7.

A. I was not a participant in the attempts to isolate human Factor V using the procedures that had been used to isolate bovine Factor V.

Q. Okay. Let's just get some terminology. When you say bovine Factor V, you are referring to something that's obtained from cows, is that right?

A. Yes.

Q. Okay.

A. From cow plasma.

Q. Okay. And when you say human Factor V, what does that mean?

A. That means the protein Factor V that is obtained from human blood.

sider this evidence to support its interpretation does not create a triable issue of fact.

Genentech advances an argument not previously made that because claim 24 claims a human VIII:C preparation substantially free of VIII:RP, and VIII:RP is found in human blood as a part of the VIII:C–VIII:RP complex, human VIII:C as used in the claims must mean VIII:C isolated from VIII:C–VIII:RP complex but not recombinant VIII:C.

It is difficult to follow the logic of this syllogism. If, as Genentech contends, recombinantly produced Factor VIII:C is free of VIII:RP, the language of claim 24 on its face does not exclude it. And even if the reference in claim 24 to VIII:RP could possibly be given the significance Genentech urges, then the *absence* of any reference to VIII:RP from claims 28 and 29 would have to be given corresponding significance, i.e., that the meaning of VIII:C as used in those claims is *not* restricted to VIII:C purified from human plasma. *See also* Reissue File History at 00429, 00431.

Genentech next argues that the use of the word "preparation" in claims 24 through 29 means that the claims refer only to a preparation obtained from humans and not to the VIII:C molecule per se. It seems to the Court that recombinantly prepared VIII:C falls no less within the definition of preparation Genentech relies on, "a substance, such as medicine, prepared for a particular purpose," Def.Mot. re Infringement at 11, than VIII:C purified from plasma. The fact that one "preparation" may contain impurities while the other does not has no bearing on the interpretation of the word in context. Inasmuch as these claims do not claim a preparation free of polymorphic forms or other impurities not encompassed by their terms or the specifications, Genentech's argument based

on the presence of such impurities in human plasma is not material on the issue of how to interpret human VIII:C in the claims.

Similarly the argument that the claims must be interpreted in light of the purity achieved by applicants at the time the application was filed is fanciful. It is clear from the file history that the applicants claimed a product of "high purity." The Examiner initially rejected claims 30–35 (now 24–29) under the first paragraph of 35 U.S.C. § 112, as not enabling products with the specific activities and potencies described by Drs. Zimmerman and Fulcher. Reissue File History at 00265, 00397–99 (describing potency as high as 4,084 units/mg and specific activity as high as 4,919 units/mg). The Examiner asked how the disclosure could be considered to enable products with such potencies and specific activities when the best values reported in the patent were only 1,727 and 2,370 respectively. In response, applicants submitted a declaration of Dr. Zimmerman stating that "[i]n his opinion the specification is fully enabling to produce essentially pure VIII:C." *Id.* at 00424. He added that it is a trivial matter and well within the skill of the art to remove trace contaminants, such as fibrinogen or fibronectin. *Id.* at 00425. On the basis of the amendment of what is now claim 24 to specify a potency range of 234 to 1172 units/mg and the explanation in the Zimmerman declaration relating to specific activity, the Examiner withdrew the rejection. *Id.* at 00420–21.

The difficulty with Genentech's argument is that it confuses—carelessly or deliberately—purity and specific activity. The latter is one measure of purity but it is not the only measure. As Dr. Zimmerman

---

Q. Okay. And what about porcine? Is there a porcine Factor V?
A. Yes, there is.
Q. And that's from pigs, is that right?
A. From pigs.
Q. Okay. Could you describe for me the attempts which are referred to in paragraph 7?
Depo. of Katzmann at 11–12. *See also* Reissue File History at 00312 ("Factor V and Factor

VIII:C are different proteins.... It was generally accepted that Factor V circulates in plasma as a distinct entity while Factor VIII:C circulates as part of the Factor VIII complex....")
The recently filed declaration of Dr. Fujikawa adds nothing. It is simply a conclusory statement bereft of any reasoning to demonstrate an error in the Court's interpretation.

testified, to determine purity one must also examine the gel patterns. Depo. of Zimmerman, vol. I at 56, 62, 64–65. A preparation with a specific activity of 4,919 units/mg, therefore, is not ipso facto twice as pure as one of 2,300 units/mg. The two preparations may, in fact, have the same purity depending on the gel patterns and other factors. *Id.* at 63, 113–15; depo. of Katzmann at 54–55. In the particular test run by Dr. Zimmerman, the difference in purity between preparations having these differences in specific activity was minimal. Depo. of Zimmerman, vol. I at 64–65, 67–68; depo. of Fulcher at 42. Both inventors testified that the method claimed in the patent produced "highly purified" VIII:C. Depo. of Zimmerman, vol. I at 61, 63; depo. of Fulcher at 29. Genentech's argument, therefore, has no bearing on the issue of claim interpretation.

B. Infringement

1. Product by Process Claim

■ For the first time, Genentech raises the bar of 35 U.S.C. § 252 against the claim of infringement of claim 13. Under § 252, the reissue of a patent does not affect preexisting infringement claims "to the extent that [the reissued] claims are identical with the original patent." As interpreted in the decisions, identical means without substantial change. *Seattle Box Co. v. Industrial Crating & Packing Co.,* 731 F.2d 818, 828 (Fed.Cir.1984). An amendment made merely for clarification does not extinguish prior infringement claims. *Kaufman Co., Inc. v. Lantech, Inc.,* 807 F.2d 970, 976–77 (Fed.Cir.1986). Whether an amendment to overcome a rejection will be treated as a substantial change depends on the circumstances. *Slimfold Mgf. Co., Inc. v. Kinkead Indus., Inc.,* 810 F.2d 1113, 1116 (Fed.Cir.1987). Where the amendment is made to overcome the Examiner's rejection of claims as unpatentable, it is a substantive change. *In re Certain Apparatus for Flow Injection Analysis,* 226 U.S.P.Q. 236, 239 (U.S.Intl. Trade Comm.1984).

■ Original claim 13 was amended by the insertion of the words "porcine or human" to modify Factor VIII:C. The specifications of the patent stated:

Sample preparations of Factor VIII, such as human and animal plasma and commercial concentrates of Factor VIII, may be employed in the present invention, and the method is not limited to a particular type of material. Preferred materials and those which have demonstrated successful results are porcine and human plasmas and commercially available concentrate of human Factor VIII, such as FACTORATE available from Armour Pharmaceutical Company. The following description provides details for using both porcine plasma or commercial human concentrate, such as Factor VIII. '509 Patent at col. 7, lines 34–40.

It is apparent from this language that the claims in the original patent were not intended to be limited to porcine or human Factor VIII:C but contemplated the use generally of "human and animal plasma." In the reissue proceedings, however, Scripps specifically distinguished its claims over the prior art contained in Dr. Vehar's article involving bovine plasma. Reissue File History at 00216–18. While it did not concede Vehar to be an "effective reference," it amended claim 13 "to plainly separate [its] human and porcine work from Vehar's bovine work." *Id.* at 00348. Considering these circumstances, the amendment must be considered more than a clarification.

Accordingly, since all of the activity alleged to have infringed the product by process claims has been found to have occurred prior to the reissue date of October 1985, the claim is barred under § 252. The order heretofore entered granting summary judgment will be amended by deleting the reference to claim 13.

2. Product Claims

Inasmuch as Genentech has not pointed to any error in the reasoning by which the Court arrived at the interpretation of the product claims, its arguments directed at the infringement finding must be considered in the light of the claims as previously interpreted. The issue therefore becomes whether Genentech's recombinant

Factor VIII:C has "the same material structural and functional characteristics as the plasma-derived preparation." 666 F.Supp. at 1390.

Genentech does not address that question except to reiterate briefly arguments the Court has heretofore considered and rejected. Def.Mot. re Infringement at 16–17. It adds that it is "a reasonable inference that the [Scripps] patent does not enable the specific activity of 6000 in Genentech's recombinant VIII:C." *Id.* at 17. There is no evidence to support this speculative statement; Genentech has never offered evidence of the specific activity of its recombinantly produced VIII:C. Evidently it now relies on a report in a newsletter which states that "monoclonal purified factor exhibits 3,200 activity units, and a genetically engineered molecule, still in the future 4,500." Def.Reply, Exh. A at 25. This vague and speculative hearsay assertion, however, has no probative value.

## II. *Inequitable Conduct*

As in the case of its arguments with respect to the interpretation and infringement issue, Genentech's arguments seeking reconsideration of the Court's grant of Scripps's motion for summary judgment on this issue and denial of Genentech's motion serve more to obfuscate and confuse than to enlighten.

Genentech's arguments fail to come to grips with the issue decided by the Court, that Genentech has not as a matter of law sustained its burden of establishing by clear and convincing evidence a threshold of materiality of the Meyer abstract.

Instead it advances a wholly novel theory for which it cites no support whatever, that Scripps violated a duty to disclose the date of the invention being patented. Def.Mot. re Inequitable Conduct at 6, lines 15–24; 11, lines 18–21; and 12, lines 4–6. The contention seems to be that only if the invention date is disclosed would the Examiner be able to determine which references could qualify as prior art under 35 U.S.C.

§ 102(a) and, hence, could constitute an absolute bar. Being wholly without support, this argument must be rejected.

It is, moreover, not material. The Examiner had no occasion to consider whether the Meyer abstract constituted prior art because Scripps withdrew the claims which the Examiner had asked it to distinguish over several references, of which the Meyer abstract was one. Reissue File History at 00419.

Thus the application of § 102(a) never became an issue, either before the Examiner or before the Patent and Trademark Office ("PTO") or before this Court. Both the PTO and the Court concluded that (1) the Meyer abstract did not disclose whether the monoclonals had the properties claimed by Scripps, and (2) the relevant information had been disclosed to the Examiner in other references. 666 F.Supp. at 1399–1400. Genentech has not taken issue with either proposition; indeed, it urged the former proposition. *See* 666 F.Supp. at 1399. Thus the argument based on the earlier date of the Meyer abstract is irrelevant.

Genentech's argument with respect to materiality—that the Court should have considered a subjective "but for" test—is difficult to follow, at best. It begins by arguing that the Meyer abstract was kept from the Examiner,[3] but then it faults the Court for having "ignored what actually happened—the Examiner selected the [Meyer] abstract ... as his principal point of concern ... (See Revlon Exh. A at 400–402 and 418)." Def.Mot. re Inequitable Conduct at 13, lines 7–11.

It is as incorrect to say that the Court ignored what the Examiner did as it is to assert that what he did was to select the Meyer abstract as his principal point of concern. *See* 666 F.Supp. at 1398. In initially rejecting the claims on the basis that one of ordinary skill could prepare monoclonal antibodies to Factor VIII:C, the Examiner relied on no less than nine referenc-

---

**3.** It charges Scripps with having "secreted" and "sequestered" it, Def.Mot. re Inequitable Conduct at 13, and implies that the "examiner had [no] knowledge of both the [RS reference] and the [Meyer] abstract," *id.* at 7.

es. Reissue File History at 00228–29. In his subsequent office action, he first directed applicants to distinguish over the Meyer abstract referenced in Muller, et al. reference [MS], and the Meyer–Zimmerman–Edgington abstract, *id.* at 00400–01, and later to demonstrate the properties of the monoclonals reported in three abstracts, including the Meyer abstract, *id.* at 00413–16, 00419. Applicants distinguished the abstracts cited as not teaching the monoclonals claimed but withdrew claims 24–29 directed at monoclonal antibodies per se because the monoclonals in the abstracts were not available and hence their properties could not be demonstrated. *Id.*

Thus, as discussed in the prior ruling, the Examiner did not single out the Meyer abstract but instead based his actions on a number of references all covering the same subject matter. And he did not reject the claims on the strength of the abstract.

As the Court's prior ruling shows, Genentech faced a heavy burden to prove materiality by clear and convincing evidence, especially in view of the adverse ruling of the PTO which is entitled to deference. Nothing Genentech has argued in its motion for reconsideration suggests that the prior ruling is incorrect.

Other arguments made by Genentech in support of its motion have been considered but do not warrant specific discussion and are rejected.

### III. *The Miles Memoranda*

Defendant Miles Laboratories, Inc. ("Miles") has filed a memorandum in conjunction with Genentech's motion for reconsideration. By this memorandum it "wishes to advise the Court on the issues it perceives must be tried with respect to its alleged infringement, which issues were never raised in connection with the summary judgment proceedings against Genentech." This somewhat obscure assertion, though not rising to the dignity of a motion or application for relief, deserves a response lest there be confusion concerning future proceedings in this action.

Miles was added as a defendant in this action pursuant to Scripps's motion, filed November 26, 1986, and granted with Miles's acquiescence on March 6, 1987. The amended and supplemental complaint states that Miles conducts business through its Cutter Laboratories division, but adds no allegations against Miles, other than that Miles through Cutter protested the issuance of the reissue patent, and that it entered into an agreement with Genentech relating to the manufacture and marketing of Factor VIII:C.

Scripps's and Genentech's motions for summary judgment were heard on March 6, 1987, and taken under submission. While they were under submission Miles wrote letters to the Court asking what role it should play in the proceeding but received no advice. It participated in discovery but chose not to take part in the briefing or request an opportunity to argue those motions.

On July 20, 1987, the Court issued its ruling on the motions for summary judgment, denying Genentech's motion and granting Scripps's motion for partial summary judgment. The ruling (as modified by the present ruling) determined that Genentech's recombinantly produced Factor VIII:C infringes certain claims of Scripps's patent. Because the Court did not rule on various defenses asserted by Genentech, it did not render a final judgment.

The July 20 ruling also determined that Genentech induced Cutter to infringe by delivering infringing Factor VIII:C to Cutter pursuant to the parties' agreement so that Cutter could develop a commercial-scale production process.

There can be no dispute concerning Miles's relation to this action. During the pendency of the action (certainly since its reactivation following issuance of the reissue patent in 1985) Miles had a direct interest in its outcome by reason of Miles's contract with Genentech. It must have been well aware that the outcome of this action would have a significant impact on that contract, and consequently on the parties to that contract.

Being in a contractual relationship with Genentech relating to Factor VIII:C and

having a very substantial financial interest in the outcome of this action, Miles must be assumed to have been following developments in it from the outset. It is noted that through Cutter it protested the issuance of the patent. Moreover, as soon as it became a party on March 6, 1987, it was provided with all papers filed in this action. It participated in certain discovery. Thus, it was in a position to know during the time when the motions were under submission whether the contentions being made by Genentech adequately protected its interests.

Miles's interests are, of course, wholly derivative: Miles is not being charged with infringement other than derivatively through Genentech, and it has asserted no rights relating to Factor VIII:C other than those derived through Genentech. In other words—and it appears to be undisputed—Miles in this action stands or falls with Genentech. This conclusion is fully confirmed by Miles's instant memoranda which in effect argue that Genentech failed to raise various factual and legal contentions.

Giving it the benefit of the doubt, the most to which Miles is entitled is to have its instant papers considered as supplemental to Genentech's motion for reconsideration, even though they are not so styled. The Court has done so and concludes that Miles's arguments addressed to the Court's interpretation of "human VIII:C" offer no new evidence or other reasons warranting a different result.

What Miles is not entitled to is to proceed—as it attempts to do here—as though it has a right to a trial on issues decided by this Court on Scripps's motion. It may, of course, argue at this time that the Court's ruling is wrong. But it is clearly bound by that ruling and does not get a second or separate bite at the apple.

Scripps argues that collateral estoppel precludes Miles from relitigating issues decided on these motions. It is not entirely clear that collateral estoppel should apply in the absence of a final judgment and while the litigation is still in progress. Compare *Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1272 (5th Cir.1986) (partial summary judgment ruling given no preclusive effect), with *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir.1961), *cert. denied*, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962) (order staying arbitration given preclusive effect even though not a final order); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980) (preliminary injunction order given preclusive effect). The Ninth Circuit has not ruled on the precise issue but has held that pendency of an appeal does not bar giving preclusive effect to the judgment appealed from. *Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1439 (9th Cir.1985). Giving preclusive effect to the instant ruling also finds support among commentators:

> There may be settings short of trial on the merits in which preclusion is warranted as to fully contested matters that have been decided beyond apparent reconsideration, notwithstanding the fact that appellate review will be available only at some time in the future. Partial summary judgment on specific issues may be a worthy example. Summary judgment at least represents a determination that the outcome of the issues is clear. At the same time it is often vulnerable to appellate reversal. Perhaps preclusion should be available only on showing that the summary judgment was thoroughly contested in the first action and that substantial burdens would be required to renew the summary judgment in the second action.

18 Wright, Miller & Cooper, *Federal Practice and Procedure* 325–26 (1981) (footnotes omitted).

But even if the collateral estoppel doctrine is not strictly applicable in this situation, the considerations underlying that doctrine compel the same result here. Miles clearly is in privity with Genentech for purposes of the issues in this action—there is complete identity of interests. *See In re Gottheiner*, 703 F.2d 1136, 1139 (9th Cir.1983). Those interests were fully and vigorously represented in the summary

judgment proceedings. Moreover, Miles was informed of the issues and had ample opportunity to present its own views to the Court (or, at least, to seek leave to do so). In these circumstances, considerations of fairness argue against requiring Scripps to relitigate issues heretofore decided. Considerations of judicial economy also support that conclusion.

Finally the Court has inherent authority to control the disposition of cases before it. *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). In the exercise of that authority, it may balance considerations of fairness and economy to determine the appropriate procedures for the decision of cases, including the extent to which it will reconsider issues previously decided. For the reasons discussed above, the Court will not permit Miles hereafter, whether at trial or on motion, to relitigate issues decided, directly or by implication, in the summary judgment proceedings.

### Conclusion

The order heretofore filed granting Scripps's motion for partial summary judgment of infringement and inducement to infringe is modified to delete the reference to claim 13.

In all other respects the motion for reconsideration is denied. Counsel are directed to appear for a status conference prepared to discuss further proceedings on March 3, 1988, at 10 a.m.

IT IS SO ORDERED.